United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEPHEN BARRY,

Plaintiff(s),

v.

UNITED STATES OF AMERICA,

Defendant(s).
_______________________________________/

No. C 11-00847 DMR

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff filed a Motion to Alter or Amend the Judgment. Defendant filed an opposition, and this court heard oral argument on March 14, 2013. The court hereby amends the January 3, 2013 Findings of Fact and Conclusions of Law by adding Finding of Fact No. 52, and amending Conclusion of Law No. 24, as well as the Conclusion section.

This case concerns an accident that occurred on December 1, 2009 aboard the USNS PFC DEWAYNE T. WILLIAMS ("the WILLIAMS" or "the Vessel"), a ship owned by Defendant United States and operated by American Overseas Marine Corporation ("AMSEA"). The incident took place during a mooring operation at Newport News, Virginia. Plaintiff Stephen Barry, the Vessel's Third Mate, was overseeing the operation when a stopper line broke, causing the mooring line to strike and injure Plaintiff's left leg. On February 23, 2011, Plaintiff brought suit under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 30901 *et seq.*, the Public Vessels Act ("PVA"), *id.* § 31101 *et*

United States District Court
For the Northern District of California

*seq.*, the Jones Act, *id.* § 30104, and general maritime law, stating claims for negligence, unseaworthiness, and maintenance and cure. (*See generally* Compl.)

The court held a bench trial in this matter. The parties filed consents to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). [Docket No. 11.] The court therefore may enter judgment in the case. *See* 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 72(b); N.D. Cal. Civ. L.R. 72-1. Pursuant to Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact and conclusions of law:

**I. Findings of Fact**

1. On December 1, 2009, Plaintiff Steven Barry was serving as a Third Mate on the WILLIAMS, a vessel owned by the United States. Plaintiff began his career in the merchant marines as an ordinary seaman, and worked his way up the ranks. He obtained his Third Mate's license in 1993, and later obtained Second Mate's and Chief Mate's licenses.

2. Plaintiff began working on the WILLIAMS in July 2009. When Plaintiff first boarded the WILLIAMS, Captain Tierney served as the vessel's Master. At the time of the December 1, 2009 incident, the Vessel's Master was Captain John Mulderig. Daniel Page served as Chief Mate.

3. The WILLIAMS is a multipurpose cargo ship that is designed to stage military war reserve equipment at sea, and deliver it to the Marine Corps as needed. The WILLIAMS was rarely docked. It generally stayed anchored in position out at sea.

4. On December 1, 2009, the WILLIAMS was in the process of docking for an extended lay-up in Newport News, Virginia. As Third Mate, Plaintiff was in charge of overseeing the mooring operation in the stern, or rear, of the Vessel. Plaintiff was injured during the stern mooring operation.

5. When Plaintiff first boarded the Vessel in July 2009, he underwent a standard officer's orientation. As part of that orientation, he reviewed a copy of the Mate Survival Guide, which he had to read and sign. The Guide contained a mooring diagram, which provided instructions for mooring the Vessel. Next to the diagram, Captain Tierney had written, "Take max strain before stopping off ~ you won't break them [the mooring lines]." At

United States District Court
For the Northern District of California

Plaintiff's request, Captain Mulderig reviewed the mooring diagram with Plaintiff prior to a November 11, 2009 mooring operation in Jacksonville, Florida, and again before the December 1, 2009 mooring operation in Newport News.

6. Plaintiff had supervised the November 2009 stern mooring operation in Jacksonville. The Jacksonville operation used the exact same equipment that was used in Newport News, and had proceeded without incident.

7. At Newport News, the WILLIAMS docked sternside in. At the time of the incident, approximately 15 mooring lines had already been secured. The accident involved the last line deployed from the stern area, which was also the last mooring line in the Vessel's entire mooring operation. The mooring line involved in the incident measured 8" in circumference and was made of nylon, which stretches under tension. The mooring line passed out of a chock, or opening, in the ship's stern. Crew members attached the outside end of the line to a large bollard on the dock. Inside the stern mooring station, and prior to its tensioning, the mooring line draped from the chock to the deck. It passed along the starboard edge of several pairs of bitts, which are capped metal posts around which a line can be affixed in a figure-eight manner. The mooring line passed between the two posts of a final pair of bitts, then curved portside. It passed around a fairlead, which is a tall, conical column that can be used to guide the angle of a line to facilitate the use of a winch. The mooring line then continued further portside to the warping head, which is part of the winch. The winch is the hydraulic machinery used to haul in the mooring line. The warping head is a large drum-shaped spool that is attached horizontally to the side of the winch. The mooring line wraps around the warping head. The winch tightens the mooring line by hauling it in.

8. Once it is hauled in, a mooring line becomes taut with tension. The crew then applies a stopper, which is a smaller line that is affixed to the mooring line. The stopper temporarily holds all of the tension in the mooring line, so that the mooring line can be released from the winch and secured to a pair of bitts in a figure-eight pattern.

9. The bitts on the WILLIAMS sit on a pedestal base. Each base has a padeye, which is a metal plate that is joined to the pedestal so that the padeye juts out perpendicular to the pedestal.

United States District Court
For the Northern District of California

The padeye has a hole through which a shackle can be passed. A shackle is a horseshoe-shaped metal fixture with a pin that closes the open end of the horseshoe. The pin passes through the padeye, and through each end of the horseshoe, thereby attaching the shackle to the pedestal. The top rounded area of the horseshoe is called the harp, and the ends of the horseshoe are called the legs.

10. On the WILLIAMS, a stopper typically would be applied to the mooring line by passing the stopper through a shackle, with the shackle attached through the padeye to the pedestal of a pair of bitts. The stopper would be bent over the shackle at the stopper's midpoint, essentially doubling the stopper. The two ends of the doubled-up stopper would then be criss-crossed around the mooring line and then wrapped or tied off.

11. Three able bodied seamen ("ABs") worked under Plaintiff's direction in the stern mooring station at the time of the incident: Claude Gordon, Jerry Stillman, and Jeffrey Tyson. Gordon operated the winch controls. Tyson tended the mooring line from a position behind the warping head. Stillman was stationed near a pair of bitts, from where he was assigned to attach the stopper to the mooring line.

12. The stopper involved in the incident was approximately 12 to 15 feet long, and was made of 1" diameter nylon rope. Prior to the accident, Page, Gordon, Stillman, and Plaintiff had all inspected the stopper line and determined that it was in serviceable condition. Gordon, who had served on the WILLIAMS for over a decade, had made some of the stoppers that were used on the day in question. He testified that the stoppers were all relatively new, and had only been used once before in the Jacksonville mooring operation.

13. The shackle involved in the incident had significant rusty scale on its harp, but not on its legs. Plaintiff and Page had inspected the shackles before the mooring operation, and determined that they were serviceable.

14. The Vessel's mooring operation began at approximately 7:00 a.m. The incident in the stern mooring area occurred at approximately 11:30 a.m. The minutes leading up to the incident unfolded as follows. At Plaintiff's instruction, Gordon operated the winch to heave in the mooring line four to six times. Gordon heard popping sounds on the line. Plaintiff was

United States District Court
For the Northern District of California

standing near a stern chock, watching the onshore portion of the mooring operation. Gordon left the winching station, walked over to Plaintiff, and told Plaintiff that he could hear the mooring line popping, and that he believed the line was too tight. Plaintiff did not respond to Gordon's statement. Gordon returned to the winching station, and Plaintiff ordered Gordon to heave in the line approximately six more times.

15. Stillman was stationed near a pair of bitts, awaiting Plaintiff's command to attach the stopper. Based on sounds coming from the mooring line, Stillman also believed it was too tight. Stillman alerted Plaintiff to his belief. Plaintiff responded by telling Stillman not to worry about the mooring line, and that it would not part.

16. Plaintiff instructed Gordon to cease heaving in the line, and then ordered Stillman to tie the stopper. Plaintiff briefly inspected the stopper after Stillman affixed it to the mooring line. Plaintiff then directed Gordon to pay out slack on the mooring line from the warping head. Tyson then began to remove the mooring line from the warping head so that the line could lose tension and go slack beyond the point where the stopper had been affixed. Plaintiff walked up the starboard side of the Vessel to the forward side of the fairlead, where he began to throw the looped mooring line off the fairlead. The mooring line piled up and lay slack on the deck between the fairlead and the winch.

17. Stillman testified that after he affixed the stopper, he inspected it to make sure it was holding. He observed that the stopper was beginning to smoke, but appeared to be holding as the other crew members slackened the mooring line from the stopper to the warping head. As Stillman reached down to pick up the mooring line to wrap it on a bitt, the stopper suddenly broke at its midpoint. Approximately thirty seconds passed between the time Stillman tied the stopper and the moment it broke.

18. Before parting, the stopper had held all of the tension that the winch had previously placed on the mooring line. When the stopper parted, the slack portion of the mooring line, which was the section between the stopper and the end of the line previously attached to the winch, suddenly regained tension, snapped upward and began to flail around. The mooring line struck Plaintiff, Stillman and Tyson. It struck Plaintiff on his left thigh, just above his knee,

United States District Court
For the Northern District of California

and raked up the inside of his left leg. Plaintiff was thrown to the ground. The mooring line also struck Stillman and Tyson in their faces, causing them to bleed. Neither Stillman nor Tyson required medical attention, and both continued working that day.

19. Plaintiff testified that he stood outside the bight, or likely path, of the line, but was flipped over by the surging mooring line, and landed inside the bight of the line. Gordon testified that he recalled Plaintiff standing within the bight of the line before the mooring line surged. However, it is more likely that Plaintiff stood outside the bight, given his uncontradicted path of travel during the mooring operation.

20. Page came down to the stern mooring station within minutes of the incident. He examined Plaintiff, then sent him ashore to receive treatment at a shoreside hospital. Using crutches, Plaintiff was able to walk off the Vessel to an ambulance. He was treated then discharged around 2:00 p.m., with instructions to ice and elevate his leg, and to follow up with his primary care physician within three to five days. Plaintiff returned to the Vessel. He stayed overnight before leaving the ship for his home in California.

**The Failure of the Stopper**

21. It is undisputed that the stopper line broke at its midpoint, where it was bent over the shackle. There is no evidence that the shackle failed.

22. Page collected the shackle and stopper after the incident, and put them in an unsealed, unmarked box that he placed on his desk in his office aboard the Vessel. In mid-January 2010, he left the Vessel at the end of his 120-day onboard rotation. Before he departed, he told Captain Mulderig, as well as his replacement, Chief Mate Patrick Brangan, that the box contained the equipment involved in the incident, and that he was keeping the equipment until he received further instruction from AMSEA. He did not receive instructions from AMSEA while he was aboard the Vessel. When he returned to the Vessel to begin his next rotation, the box and its contents were gone. Defendants lost the shackle and stopper sometime after the incident, and they were never recovered. Consequently neither the shackle nor the stopper was subject to close inspection or testing.

United States District Court
For the Northern District of California

23. The court finds that the stopper itself was not defective. After the incident, Page inspected the broken stopper line. It appeared stretched out, and was partially melted or fused to the mooring line, and crackled as he removed it from the mooring line. Page did not observe any defects in the stopper, other than what appeared to have been caused by the incident itself. Several individuals, including Plaintiff, had visually inspected the stopper before it was deployed, and determined that it was serviceable. Gordon testified without contradiction that the stopper was relatively new, and had only been used in one prior mooring operation. No evidence supports the theory that the stopper was defective.

24. The court finds that the rust on the harp of the shackle did not cause the stopper to part. The stopper pulled against the leg, rather than the harp of the shackle. The legs of the shackle did not appear to be rusty. Once the tension on the mooring line was displaced onto the stopper, the stopper would have not moved. It is therefore unlikely that the rust damaged the stopper, or contributed to its breakage.

25. The court finds that the stopper provided by Defendant was of insufficient tensile strength to perform the job for which it was intended.

26. The mooring line could hold approximately 60 tons of tension before breaking. However, it would not be possible for the mooring line to have taken on such tension, because it was not affixed to the winch. Instead, it was held in place by its own weight and friction caused by the mooring line wrapping around itself as it wound around the drum of the warping head.

27. The winch had a maximum heaving capacity of 24 tons. If the tension placed on the mooring line exceeded this level, the warping head would surge, releasing the excess tension. Thus, if the tension on the mooring line surpassed 24 tons, the drum would "surge," or spin inside of the wraps of the mooring line, without further tensioning the line. Therefore, the winch's pulling strength limit ensured that no more than 24 tons of tension could have been on the mooring line when the stopper failed.

28. Captain Robert Stewart testified as an expert witness for Plaintiff. He graduated from the United States Merchant Marine Academy, and has held a Master's License for thirty years. He has served on the faculty of the California Maritime Academy in Vallejo, California for

United States District Court
For the Northern District of California

nearly thirty years. Since 1995, Captain Stewart has served as an officer on the vessel that is used for training cadets. Part of that training includes mooring operations.

29. Captain John Porter testified as an expert for the defense. He graduated from the California Maritime Academy, and has held a Master's License for forty years. He also holds a first class pilotage, which permits him to pilot a ship in U.S. waters. He was routinely involved in mooring operations as a ship's officer, and has also served as a mooring master.

30. Both experts agreed that as a rule of thumb for good seamanship, a stopper should be able to hold half of the maximum strain capacity of the mooring line. In this case, if the breaking load of the mooring line was 60 tons, the stopper should have had a breaking load of 30 tons. The 1" nylon stopper in question had a breaking load of 10 tons, which increased to 20 tons, since the stopper was doubled.

31. Captain Porter conceded that the stopper line provided by the vessel owner, which had a maximum breaking load of 20 tons, was not sufficient to accommodate the maximum strain on the mooring line when the strain was transferred to the stopper.

32. The court finds that Plaintiff did not contribute to the incident by ordering that the mooring line be heaved in too tightly, or by ignoring the warnings of Gordon and Stillman. The maximum heaving capacity of the winch was 24 tons. Had Defendant provided an adequate stopper that could bear at least 30 tons of tension, the stopper would not have broken. By taking "max strain" on the mooring line, Plaintiff followed the written standing order of the Vessel's captain.

33. The court finds that Plaintiff did not contribute to the incident by failing to order Stillman to deploy two stoppers instead of only one. There is no record evidence that two stoppers had ever been used on a stern mooring line aboard the WILLIAMS. It was customary practice to use only one stopper per mooring line on the Vessel. The mooring operation that took place one month earlier in Jacksonville had used single stoppers.

34. Captain Porter conceded that the only time he had ever seen use of a double stopper was in the presence of dynamic conditions which could cause the vessel to move, such as current or movement in the water, or mooring to a buoy. There is no evidence that the WILLIAMS

moved, or was in danger of moving. At the time of the incident, fifteen other mooring lines had already been secured. Moreover, the Vessel's ramp had been deployed. It weighs approximately 85 tons, and acted as a large anchor to hold the ship in position.

35. The court finds that Plaintiff did not contribute to the incident by failing to know or work within the limits of the equipment, or by ordering maximum strain (24 tons) on the winch when the stopper could only bear 20 tons of strain. The court finds that the Vessel should have provided adequate equipment in this instance, rather than placing the burden of knowledge on Plaintiff. Indeed, Captain Mulderig testified that he did not know the heaving capacity of the winch, or the tensile strength of the mooring line.

36. The court finds that Defendant did not provide an incompetent AB who failed to warn crew members when he saw that the stopper was smoking. The incident happened quickly. Only 30 seconds passed between the moment Stillman applied the stopper and the moment it broke. Stillman had already told Plaintiff that he believed the mooring line was too tight, and Plaintiff had responded that it was okay. Under these circumstances, and viewed in context, Stillman's failure to report the smoking stopper does not indicate that he was incompetent.

37. The court finds that the configuration of the padeye and shackle did not contribute to the failure of the stopper. Captain Stewart opined that the Vessel should have been designed, or the mooring operation modified, to make sure that the stopper pulled against the harp rather than the leg of the shackle. However, the shackle itself did not break, nor was there persuasive evidence that the configuration reduced the tensile capacity of the stopper in any significant manner.

**The Nature and Extent of Plaintiff's Injury**

38. Plaintiff contends that as a result of the incident, he can no longer perform the physical duties required for working onboard a ship. Plaintiff reports constant leg and knee pain. In his daily life, Plaintiff avers that he cannot walk long distances, pick up or play sports with his child, or do house and yard work. Plaintiff has not worked in any capacity since December 1, 2009.

He has been enrolled in a educational program to obtain a master's degree and a teaching credential.

39. The court finds that the incident caused Plaintiff to incur a contusion and hematoma on his left thigh down to his foot, which healed in eight weeks. The injury resulted in permanent discoloration and diminution of sensation on a portion of Plaintiff's left leg.

40. Beyond that, the incident did not result in injury to Plaintiff's left knee, left leg, or back.

41. Because the incident caused only a left thigh contusion, hematoma, discoloration and diminution of sensation, if Plaintiff was unable to return to work at sea thereafter, it was due to his preexisting underlying left knee conditions, and not to the incident.

42. Plaintiff has a history of left knee problems dating back to 1985. In 2002, he injured his left knee on the USNS WATKINS while stepping over a mooring wire. By that time, he had already been experiencing left knee pain, catching and swelling that had become progressively worse over the previous two years. By 2002, he had severe narrowing arthritic changes in the knee. These problems led to arthroscopic surgeries on his left knee in 2002 and 2003. Plaintiff reinjured his left knee in 2005 on the ship CAPE ISLAND when his left foot came down on a steel deck. Plaintiff also sustained an injury in November 2007 on the ship TYCO DURABLE. In the latter incident, a cable hit him in the chest, and "rattled" his back and knees. From January 2007 through June 2008, Plaintiff did not work due to his back and knee disabilities.

43. Dr. Frank Mainzer testified as an expert for the defense. He has been a board certified radiologist since 1971. He served as the Chairman of the Radiology Department of St. Francis Memorial Hospital from 1971 to 2009, and currently teaches at UCSF medical school. Dr. Mainzer examined Plaintiff's medical records, as well as imaging studies (X-rays and MRIs) of Plaintiff's left knee, both pre- and post-incident. A 2007 X-ray indicated moderately severe narrowing of the medial compartment, suggestive of cartilage disease. The 2007 MRI indicated severe and active cartilage disease limited to the medial aspect of the left knee. It also showed a truncated medial meniscus, consistent with prior meniscal surgery. It indicated joint effusion (or collection of water) in the front of the knee, fluid in the soft

tissues, and some encapsulated fluid in the back of the knee, all suggestive of active knee problems.

44. Dr. Mainzer compared the pre-incident imaging studies to an MRI taken on January 15, 2010, approximately six weeks after the incident. The post-incident MRI also indicated cartilage disease in the medial aspect of the left knee, but did not show any changes from the 2007 study. Dr. Mainzer opined that the post-incident MRI showed no evidence of bone bruising or recent traumatic abnormality, all of which should be discernable in an MRI. Indeed, Dr. Mainzer testified that Plaintiff's left knee appeared to have improved since 2007, since the post-incident MRI did not show effusion on the front of the knee cap as had been present in 2007. Dr. Mainzer concluded that the imaging studies demonstrated no evidence whatsoever of an injury to Plaintiff's left knee from the December 1, 2009 incident. All of the findings in the 2010 MRI were present in the 2007 MRI, and the 2010 MRI contained no evidence that the incident caused any physiological change to Plaintiff's left knee. Dr. Mainzer testified that MRI scans are very sensitive, and would show any significant abnormality. Therefore, according to Dr. Mainzer, the information in the 2010 MRI ruled out the possibility that the incident caused any significant anatomic injury or aggravation to pre-existing conditions, but did not rule out minor soft tissue injury.

45. Dr. John Missirian, a board certified orthopedic surgeon, testified as an expert for the defense. Dr. Missirian specializes in lower-extremity surgeries, including knee surgeries. He reviewed Plaintiff's pre- and post-incident medical history, including imaging studies, and performed an independent medical evaluation of Plaintiff in November 2011.

46. Dr. Missirian noted that the X-rays of Plaintiff's left knee, taken on the day of the accident, showed no fractures or dislocations. The X-rays also did not indicate swelling or fluid accumulation, which would be expected after an acute injury. Dr. Missirian also opined that the January 2010 post-injury MRI of Plaintiff's left knee showed only pre-existent advanced degenerative knee problems, and did not exhibit any evidence of a post-traumatic injury. Of note, Plaintiff's physical examination revealed skin discoloration on the inner part of the left thigh, slightly larger than five square inches in size, beginning approximately five inches

United States District Court
For the Northern District of California

above the kneecap. The discolored area had decreased sensitivity to touch. Dr. Missirian testified that the incident on the WILLIAMS caused injury to Plaintiff in the form of a soft tissue contusion on the left thigh, but did not injure Plaintiff's left knee or lower back.

47. Dr. Missirian opined that the incident onboard the WILLIAMS caused no permanent injury to Plaintiff's left knee, and that Plaintiff sustained a soft tissue injury that was healed within six to twelve weeks of the incident. The permanent skin discoloration and loss of sensation in a portion of Plaintiff's left leg reached maximum healing in that time frame.

48. Dr. Missirian testified that due to Plaintiff's longstanding problems, Plaintiff would likely require knee replacement within the next five to ten years, and that there was no evidence that the incident on the WILLIAMS hastened Plaintiff's need for knee replacement surgery. Dr. Missirian also testified that Plaintiff could not experience a significant change in his physical abilities without some evidence of injury in the MRI of his left knee.

49. Dr. Fred Blackwell, a board certified orthopedic surgeon, testified as Plaintiff's medical expert. Dr. Blackwell retired from performing surgeries in 1995, but continues to practice as an orthopedist. Dr. Blackwell is Plaintiff's treating orthopedist, and first examined him on December 22, 2009, approximately three weeks after the incident onboard the WILLIAMS. Dr. Blackwell agreed that the contusion suffered by Plaintiff resolved within a couple months.

50. Dr. Blackwell testified that the injury may have resulted in atrophy to the vastus medialis obliquus ("VMO") muscle that is part of the quadriceps muscle group. The VMO plays a major role in stabilizing the knee when it is in motion. However, although Dr. Blackwell found VMO atrophy upon examination, he did not measure it. Nor could Dr. Blackwell attribute the VMO atrophy to the incident, as opposed to underlying pre-existing problems with Plaintiff's left knee.

51. Dr. Blackwell opined that the incident triggered the underlying progressive pathology in Plaintiff's knee, resulting in chronic pain and instability. The court is not persuaded by Dr. Blackwell's testimony and opinion on this point. Dr. Blackwell conceded that he did not review the pre- and post-injury MRI studies, and therefore was unable to comment on whether

United States District Court
For the Northern District of California

anything changed comparatively in Plaintiff's left knee between 2007 and 2010. Dr. Blackwell testified that he believed that Plaintiff had an underlying pathology that was relatively asymptomatic for a long time, and that it suddenly became symptomatic after the injury. However, he conceded that such a change should be discernable in an MRI. As noted, Dr. Blackwell did not examine the MRIs, but Drs. Mainzer and Missirian did, and both testified that by comparing the pre- and post-incident MRIs, they were able to ascertain no evidence of significant injury to Plaintiff's left knee resulting from the incident. Dr. Blackwell conceded that he reached his medical conclusion based in large part on Plaintiff's self-reports, and that he could not point to any objective medical record upon which he relied in reaching his conclusions.

52. The most credible calculation of Plaintiff's average pre-injury annual salary is $73,565.

**II. Conclusions of Law**

1. This case presents an admiralty and maritime matter within the meaning of Federal Rule of Civil Procedure 9(h).

2. Defendant United States, owner of the Vessel, has waived its sovereign immunity and consented to this suit under the terms of the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 30901 *et seq.*

3. Because Plaintiff's injury occurred on the WILLIAMS, a public vessel of Defendant United States, the court has jurisdiction over his claims subject to the Public Vessels Act ("PVA"), *id.* § 31101 *et seq.*, which incorporates provisions of the SIAA.

4. The PVA contains an Exclusive Remedy Provision, which mandates that if the PVA provides a remedy, "'it shall be exclusive of any other action arising out of the same subject matter against the officer, employee, or agent of the United States.'" *Creps v. Truco Marine, LLC*, No. 11-1751 DMR, 2011 WL 5577083, at *2 (N.D. Cal. Nov. 8, 2011) (quoting 46 U.S.C. § 30904). Stated simply, "a plaintiff may bring an action grounded in the act of a government agent on a public vessel only against the United States." *Id.* (citing *Watts v. Pinckney*, 752 F.2d 406, 409 (9th Cir.1985)) (citation omitted).

5. Plaintiff alleges that Defendant, through its agents, employees, and servants on the WILLIAMS, violated the Jones Act, 46 U.S.C. § 30104, by negligently and carelessly causing Plaintiff to sustain personal injuries; by failing to provide Plaintiff with adequate and sufficient medical care and attention; and by causing Plaintiff general damages in excess of $500,000, past and continuing special medical damages, and loss of past and future earnings in excess of $250,000. (*See* Compl. ¶¶ 1-8.)

6. Under the Jones Act, seamen, such as Plaintiff, receive rights parallel to those of railway employees under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*. § 30104; *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 662 n.5 (9th Cir. 2009); *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc). Section 51 of the FELA provides, in relevant part, that "[e]very common carrier by railroad . . . shall be liable in damages . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." § 51.

7. To prevail on a Jones Act negligence claim, a plaintiff must prove the following elements: "duty, breach, notice and causation." *Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658, 662 (9th Cir. 1997) (citing *Havens v. F/T Polar Mist*, 995 F.2d 215, 218 (9th Cir. 1993); *Matson Navigation Co. v. Hansen*, 132 F.2d 487, 488 (9th Cir. 1492)) (citation omitted). The employer of a seaman owes the seaman a duty "to provide the seaman with a safe place to work," *id.* (citing *Glynn v. Roy Al Boat Mgmt. Corp.*, 57 F.3d 1495, 1498 (9th Cir. 1995); *Matson Navigation Co.*, 132 F.2d at 488), which encompasses the duty to provide adequate equipment, *see Robinson v. Zapata Corp.*, 664 F.2d 45, 47-48 (5th Cir. 1981). With respect to notice, an employer is liable under the Jones Act "if the employer or its agents either *knew* or *should have known* of the dangerous condition" at issue. *Ribitzki*, 111 F.3d at 663 (citing *Havens*, 996 F.2d at 218; *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1543 (11th Cir. 1989); *Williams v. Tide Water Associated Oil Co.*, 227 F.2d 791, 794 (9th Cir. 1956)); *see also id.* ("This implies a duty of reasonable inspection. . . ."). Turning to causation, a seaman will recover under the Jones Act "if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux*, 107 F.3d at 335; *accord Ribitzki*, 111 F.3d at 662.

United States District Court
For the Northern District of California

8. A plaintiff's recovery pursuant to a Jones Act negligence claim is subject to the doctrine of contributory fault. *Simeonoff v. Hiner*, 249 F.3d 883, 888-89 (9th Cir. 2001) ("Contributory negligence is applicable to mitigate damages when a seaman is injured if alternative courses of action are available to the injured party, and he chooses the unreasonable course." (citations and quotation marks omitted)). The court measures comparative fault "by what a reasonable person would have done under similar circumstances." *Id.* at 889 (citing *Am. President Lines, Ltd. v. Welch*, 377 F.2d 501, 504-05 (9th Cir. 1967)).

> A seaman, then, is obligated under the Jones Act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, and a Jones Act negligence action becomes one of the reasonable *seaman* in like circumstances.

*Gautreaux*, 107 F.3d at 339 (citation omitted).

9. Similarly, under the primary duty rule, "'a seaman-employee may not recover from his employer for injuries caused by his own failure to perform a duty imposed on him by his employment.'" *N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095 (9th Cir. 2002) (quoting *Cal. Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 836-37 (9th Cir.1989)) (citation omitted). The rule incorporates the following limitations:

> First, the duty "will not bar a claim of injury arising from the breach of a duty that the plaintiff did not consciously assume as a term of his employment. Second, the rule does not apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated. Third, the rule applies only to a knowing violation of a duty consciously assumed as a term of employment."

*Id.* (quoting *Bernard*, 22 F.3d at 907). Therefore, for an employer to escape liability under the primary duty rule:

> (1) the seaman must have consciously assumed a duty as a term of employment; (2) the dangerous condition that injured the seaman must have been created by the seaman or could have been controlled or eliminated solely by the seaman in the proper exercise of his or her employment duties; and (3) the seaman must have knowingly violated a duty consciously assumed as a condition of employment.

*Id.* at 1096 (citation omitted).

United States District Court
For the Northern District of California

10. Plaintiff also alleges that on or around December 1, 2009, that the WILLIAMS was unseaworthy in that it was an unsafe place to work and that Defendant did not provide the Vessel with a competent crew. These allegedly unseaworthy conditions caused Plaintiff to sustain severe injuries and damages in excess of $500,000, including medical costs and lost earnings. (*See* Compl. ¶¶ 9-15.)

11. The doctrine of unseaworthiness requires a shipowner "'to furnish a vessel and appurtenances reasonably fit for their intended use.'" *Faraola v. O'Neill*, 576 F.2d 1364, 1366 (9th Cir. 1978) (quoting *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)). The duty to furnish a seaworthy ship "is absolute and completely independent of [the owner's] duty under the Jones Act to exercise reasonable care." *Mitchell*, 362 U.S. at 549 (citations omitted). Although unseaworthiness imposes strict liability upon a shipowner, "'(s)eaworthiness is a relative term; a vessel may have that quality in port, and may yet be wholly unfit for rough water.'" *Faraola*, 576 F.2d at 1366 (quoting *Lester v. United States*, 234 F.2d 625, 629 (2d Cir. 1956)) (parentheses in original); *accord Mitchell*, 362 U.S. at 550 ("The standard is not perfection, but reasonable fitness . . . .") (citation omitted); *see Moore v. United States*, 347 F. Supp. 38, 41 (N.D. Cal. 1972) ("The vessel owner is not an insurer and he need not provide an accident-proof ship.") (citations omitted).

12. To establish a claim for unseaworthiness, a plaintiff must prove the following factors by a preponderance of the evidence: "(1) the warranty of seaworthiness extended to him and his duties; (2) his injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment used was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately caused his injuries." *Ribitzki*, 111 F.3d at 664 (citing *Faraola*, 576 F.2d at 1366; *Gebhard v. S.S. Hawaiian Legislator*, 425 F.2d 1303, 1310-12 (9th Cir. 1970)). The unseaworthiness must be a "substantial factor" in causing the injuries. *Faraola*, 576 F.2d at 1366 (citation omitted).

13. Neither contributory negligence nor voluntary assumption of risk provides a defense to unseaworthiness, but the court may take them into account in mitigation of damages. *Reinhart v. United States*, 457 F.2d 151, 152 (9th Cir. 1972) (citing *Socony-Vacuum Co v.*

United States District Court
For the Northern District of California

*Smith*, 305 U.S. 424, 431 (1939); *The Max Morris*, 137 U.S. 1 (1890)). A plaintiff will not recover for injuries "sustained if they were caused proximately and solely by his own negligence." *Moore*, 347 F. Supp. at 41 (citations omitted).

14. The primary duty rule, discussed above, also applies to unseaworthiness. *See N. Queen Inc.*, 298 F.3d at 1095. "[A] seaman-employee may not recover from his employer for injuries caused by his own failure to perform a duty imposed on him by his employment." *Id.* (quoting *Cal. Home Brands, Inc.*, 871 F.2d at 836-37) (citation omitted). However,

> the duty "will not bar a claim of injury arising from the breach of a duty that the plaintiff did not consciously assume as a term of his employment. Second, the rule does not apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated. Third, the rule applies only to a knowing violation of a duty consciously assumed as a term of employment."

*Id.* (quoting *Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 907 (9th Cir.1994)). Therefore, for an employer to avoid liability under the primary duty rule:

> (1) the seaman must have consciously assumed a duty as a term of employment; (2) the dangerous condition that injured the seaman must have been created by the seaman or could have been controlled or eliminated solely by the seaman in the proper exercise of his or her employment duties; and (3) the seaman must have knowingly violated a duty consciously assumed as a condition of employment.

*Id.* at 1096 (citation omitted).

15. Plaintiff also alleges that Defendant did not fully provide him with maintenance and cure after his injury, and requests compensation for the expenses that he incurred while incapacitated. (*See* Compl. ¶¶ 17-18.)

16. A shipowner must provide maintenance and cure "to care for the seaman taken ill or disabled during a voyage or during the course of his maritime employment." *Crooks v. United States*, 459 F.2d 631, 632 (9th Cir. 1972) (footnote omitted). The obligation arises at the time of injury and continues "until cure (or the closest possible approach to cure) ha[s] been obtained." *Id.* at 633 (citing *Farrell v. United States*, 336 U.S. 511, 517 (1949); *Stanovich v. Jurlin*, 227 F.2d 245 (9th Cir. 1955)).

17. A plaintiff may not benefit from maintenance and cure if it would provide him with double recovery. *Id.* "No matter what the basis of the shipowner's obligation, or on how many

grounds it may be rested . . . lost wages cannot be recovered more than once.  Nor can the cost of maintenance or cure." *Id.* (footnote omitted).

18. The court finds Defendant liable for Plaintiff's injury under the Jones Act claim.  Defendant had a duty to provide Plaintiff with a safe working environment, including adequate equipment to perform his duties.  Defendant breached this duty because it supplied Plaintiff with a stopper too weak to perform the mooring operation in a manner which seamen would customarily expect to be safe.  During a mooring operation, a seaman normally would expect a stopper to withstand stress equivalent to one-half of a mooring line's capacity, in this case 30 tons.  The stopper on the Vessel, however, could take only 20 tons before breaking.  Defendant and its agents had notice of this dangerous condition because they knew, or should have known, the customary equipment strength requirements.  Moreover, Defendant and its agents procured the 1" stopper nylon line and thus knew, or should have known, of its inadequate strength.  Because Defendant negligently provided a stopper that could endure only 20 tons of stress, and not the 30 tons that a reasonable seaman would expect, the stopper failed during the mooring operation when subjected to no more than 24 tons of tension.  This failure caused the mooring line to strike and injure Plaintiff.

19. Defendant did not demonstrate that Plaintiff acted unreasonably for a seaman during the mooring operation.  Plaintiff therefore is not subject to contributory fault or the primary duty rule for his Jones Act claim.

20. The court also finds that Plaintiff prevails in his unseaworthiness claim.  He has demonstrated that the warranty of seaworthiness extends to him and his duties, and that a piece of the ship's equipment caused his injury, because he was a seamen injured by being struck by a mooring line after the stopper restraining it broke.  He satisfies the third prong because the stopper was not reasonably fit for its intended use.  In a mooring operation, a seaman normally would expect a stopper to withstand stress equivalent to one-half of a mooring line's capacity, in this case 30 tons.  The stopper on the Vessel, however, could take only 20 tons without failing, and it indeed did fail when subjected to no more than 24 tons of stress.  Plaintiff meets the

United States District Court
For the Northern District of California

final prong of the test, because the inadequate stopper's failure caused the mooring line to flail about the stern mooring room and strike and injure him.

21. Defendant did not demonstrate that Plaintiff acted unreasonably for a seaman during the mooring operation. Plaintiff therefore is not subject to contributory fault or the primary duty rule for his unseaworthiness claim.

22. Defendant is liable to Plaintiff for any unpaid maintenance and cure resulting from his injury aboard the Vessel, from the date of the incident until Plaintiff's injury healed eight weeks later.

23. The court awards $30,000 to Plaintiff for pain and suffering, distress, discomfort, loss of sensation, and permanent discoloration of his left leg.

24. The court awards $8775.74 to Plaintiff for eight weeks of lost wages. The court calculated this amount by using an average annual salary of $73,565 to derive $11,317.69 as representing eight weeks' of lost wages. The court then subtracted 22.46% in state and federal taxes.

**III. Conclusion**

The court finds Defendant liable to Plaintiff for negligence under the Jones Act, unseaworthiness, and maintenance and cure. Defendant shall pay Plaintiff $30,000 in general damages, $8775.74 in lost wages, and any unpaid maintenance and cure.

IT IS SO ORDERED.

Dated: April 1, 2013

DONNA M. RYU
United States Magistrate Judge